James and Joyce **FERRELL**, et al., Plaintiffs,

v.

Samuel **PIERCE**, Secretary of the Department of Housing and Urban Development (HUD); Philip Abrams, General Deputy Assistant Secretary of Housing-Federal Housing Commissioner, HUD; The United States Department of Housing and Urban Development, Defendants.

No. 73 C 334.

United States District Court, N.D. Illinois, E.D.

April 7, 1983.

Frances W. Werner, David M. Madway, Nat. Housing Law Project, Berkeley, Cal., William P. Wilen, Legal Assistance Foundation of Chgo., Chicago, Ill., George D. Gould, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

J. Paul McGrath, Asst. Atty. Gen., Alphonse M. Alfano, Sheila Lieber, U.S. Dept. of Justice, Washington, D.C., Dan K. Webb, U.S. Atty., Chicago, Ill., for defendants; Richard Stearns, Office of Gen. Counsel, H.U.D., Washington, D.C., of counsel.

## MEMORANDUM OPINION

WILL, Senior District Judge.

This class action was instituted in 1973 to assert various alleged rights to foreclosure avoidance relief of the plaintiff class of low and moderate income families who had purchased homes with insured home mortgages under specified sections of the National Housing Act. In 1976, plaintiffs and the then-remaining defendants, the United States Department of Housing and Urban Development (hereinafter "HUD" or "the Department") and certain of its officials, theoretically settled the lawsuit. As part of the settlement, HUD agreed to implement a revised policy for accepting assignments of insured mortgages in default in order to provide foreclosure avoidance assistance to members of the plaintiff class. Our order, dated July 29, 1976, approved the settlement and dismissal and incorporated by reference the parties' stipulation detailing HUD's obligations with respect to mortgage assignments.

Thereafter, from time to time, the plaintiffs objected to HUD's alleged violations of the July 1976 order. Finally, in August 1979, the parties agreed to an Amended Stipulation which we approved in November of that year. In the Amended Stipulation, HUD acknowledged that there had been "a significant incidence of error in the administration of the [assignment] program" and agreed subsequently to administer that program in accordance with an internal manual, HUD Handbook No. 4191.-2, later renumbered as HUD Handbook 4330.2 (hereinafter "the Handbook"), which had been reviewed by counsel for the plaintiff class and was incorporated by reference in the Amended Stipulation.

This matter is before us again on defendants' motion to modify our November 1979 order incorporating and approving the Amended Stipulation and on the plaintiffs' motion to hold the defendants in civil contempt for violation of the Amended Stipulation. We held a hearing on both motions commencing on September 30, 1982, and have subsequently received briefs from the parties. For the reasons hereinafter stated, defendants' motion to modify the Amended Stipulation is denied. The defendants are enjoined from implementing certain proposed regulations relating to Temporary Mortgage Assistance Payments and Assignments to HUD as previously published, 47 Fed.Reg. 33252 (1982). Plaintiffs' motion for contempt is also denied.

### The Amended Stipulation

The Amended Stipulation, which is the focus of both motions, provides in paragraph 3 for HUD's operation of a mortgage assignment program consistent with the terms of the Handbook. Paragraph 3 provides:

> HUD Handbook 4191.2, attached hereto as Appendix A, shall constitute binding instructions for implementation of the assignment program subsequent to the entry of this order. The Department shall administer the assignment program substantially in accordance with the terms of said Handbook .... The provisions of the Handbook may be modified in accordance with the Department's usual procedures. However, during the term of this Amended Stipulation the Department will not make any modification which would curtail the basic rights of mortgagors under the program now in existence. The Department will give notice to plaintiffs' counsel prior to final action on any modification.

The duration of the obligations created by the Amended Stipulation is set out in paragraph 14 of that agreement, which provides:

> Except as provided in this paragraph, the rights and obligations created by this Amended Stipulation shall terminate five years from date of execution. The termination of the Department's specific obligations under this Amended Stipulation shall not diminish or compromise the Department's obligation construed under the National Housing Act as amended, and Section 2 of the Housing Act of 1949 and Section 2 of the Housing and Urban Development Act of 1968 to provide foreclosure avoidance relief for mortgagors in temporary financial distress, and the Department shall provide assistance or relief in the form of the present assignment program or an equivalent substitute to permit mortgagors in default on their mortgages to avoid foreclosure and to retain their homes during periods of temporary financial distress.

The Handbook, which is incorporated in the Amended Stipulation, sets out procedures for HUD's acceptance of assignments. It lists five eligibility criteria for preforeclosure mortgage assignment assistance, the two most important of which are that the circumstances leading to default have been beyond the mortgagor's control and that there be a "reasonable prospect" that the mortgagor will be able to resume full mortgage payments following a 36-month period of full or partial forbearance. The Handbook also purports to describe the required terms for mortgage payments to HUD on assigned mortgages. Those Handbook provisions relating to the terms of payment and other relevant provisions are set out and discussed in some detail hereafter.

The Amended Stipulation further provides that HUD will maintain and furnish to the plaintiffs' counsel monthly statistical reports on the processing of applications for assignment. Amended Stipulation ¶ 9. The monthly reports are to show the number of applications HUD has received, the number of assignments actually accepted and the number referred back to the mortgagee for what is termed "further servicing." They further indicate, with respect to mortgages accepted for assignment, whether the mortgagor has had payments reduced or suspended or is making a full or increased mortgage payment to HUD.

*Statutory Developments*

The statutory authority for the Department's operation of a mortgage assignment program was, at the time of the Amended Stipulation, contained in former Section 230 of the National Housing Act, 12 U.S.C. § 1715u (1968), which provided in pertinent part:

> Upon receiving notice of the default of any mortgage covering a one-, two-, three-, or four-family residence heretofore or hereafter insured under this chapter, the Secretary, in his discretion and for the purpose of avoiding foreclosure of the mortgage, and notwithstanding the fact that he has previously approved a request of the mortgagee for an extension of time for curing the default and of the time for commencing foreclosure proceedings or for otherwise acquiring title to the mortgaged property, or has approved a modification of the mortgage for the purpose of changing the amortization provisions by recasting the unpaid balance, may acquire the loan and security therefor upon payment of the insurance benefits in an amount equal to the unpaid principal balance of the loan plus any unpaid mortgage interest plus reimbursement for such costs and attorney's fees as the Secretary finds were properly incurred in connection with the defaulted mortgage and its assignment to the Secretary, and for any proper advances theretofore made by the mortgagee under the provisions of the mortgage.

As is apparent from a previous opinion in this case, HUD has a statutory obligation which formed the basis for the Amended Stipulation to provide mortgage foreclosure avoidance relief in a manner that will advance the national housing policy, stated in 42 U.S.C. § 1441, of providing a decent home and suitable living environment for every American family. *Brown v. Lynn,* 385 F.Supp. 986, 998–99 (N.D.Ill.1974).

Congress has since enacted the Housing and Community Development Act of 1980, P–L 96–399, 94 Stat. 1614, 1659, which amends Section 230 of the National Housing Act, 12 U.S.C. § 1715u (hereinafter "section 230" or "amended section 230") to permit HUD to provide foreclosure avoidance relief in the form of Temporary Mortgage Assistance Payments (TMAP) to lending institutions on behalf of eligible mortgagors as well as in the previously provided for form of mortgage assignment. Under TMAP, the mortgagee retains the mortgage and receives payments from HUD. Under the assignment program, the mortgage itself is conveyed to HUD, which arranges terms for the mortgagor to make payments to it. The amended version of section 230 now allows for provision of the TMAP form of mortgage foreclosure avoidance assistance under the same conditions as those under which assignment was available under the earlier statute, as implemented by the Handbook. Paragraph (a)(1) of the statute as amended provides:

> (a)(1) Upon receiving notice of the default of any mortgage covering a one-, two-, three-, or four-family residence insured under this chapter, the Secretary (for the purpose of avoiding foreclosure of the mortgage, and notwithstanding the fact that the Secretary has previously approved a request of the mortgagee for an extension of the time for curing the default and of the time for commencing foreclosure proceedings or for otherwise acquiring title to the mortgaged property, or has approved a modification of the mortgage for the purpose of changing the amortization provisions by recasting the unpaid balance) may make all or part of the monthly payments due under the mortgage directly to the mortgagee on behalf of the mortgagor, if such default was caused by circumstances which are beyond the mortgagor's control and render the mortgagor temporarily unable to correct a mortgage delinquency and to resume full mortgage payments. Payments may be made only in accordance with the provisions of this subsection and shall be subject to any additional requirements the Secretary may prescribe.

The additional restriction on eligibility for relief now on the face of the statute— that the default shall have been caused by circumstances beyond the mortgagor's control which render the mortgagor temporari-

ly unable to correct the delinquency and resume full payments—is a codification of an eligibility criterion contained in the Handbook implementing the assignment program under the previous statute. *See* Handbook ¶ 2–1(d).[1]

Amended section 230 now codifies the "reasonable prospect" criterion now contained in the Handbook ¶ 2–1(e).[2] Paragraph (a)(2) now provides:

(2) No payments may be provided under this subsection unless the Secretary has determined that such payments are necessary to avoid foreclosure and that there is a reasonable prospect that the mortgagor will be able—

(A) to resume full mortgage payments within thirty-six months after the beginning of the period for which such payments are provided or upon termination of assistance under this subsection;

(B) to commence repayment of the payments made under this subsection at a time designated by the Secretary; and

(C) to pay the mortgage in full by its maturity date or by a later date established by the Secretary for completing the mortgage payments.

Although the wording of the statute is different from that in the Handbook and although the statute, in subparagraph (a)(2)(C), does not set a 10-year limit on possible mortgage term extension—as does the Handbook ¶ 2–1(e)—it is apparent that the differences are immaterial to operation of a TMAP program equivalent to the assignment program envisioned by the Handbook.

Paragraph (a)(3) provides for a level of assistance "in an amount determined by the Secretary" that may be as much as the total principal and interest due under the mortgage plus enumerated additional taxes, assessments and other expenses. The subsection provides:

(3) Payments under this subsection may be in an amount determined by the Secretary up to the amount of the principal, interest, taxes, assessments, ground rents, hazard insurance, mortgagee's expenses in connection with payments or repayments under this subsection, and mortgage insurance premiums due under the mortgage, and the initial payment may include an amount necessary to make the payments on the mortgage current. Payments may not exceed amounts which the Secretary determines to be necessary to supplement the amounts, if any, which the mortgagor is capable of contributing toward the mortgage payments.

Paragraph (a)(4) governs the duration of TMAP. This paragraph provides for an initial limit of 18 months after default on the period for which payments may be made on behalf of a mortgagor and for extension of the initial assistance period by up to 18 more months. Provision is made for periodic review of the mortgagor's need during the assistance period. Paragraph (a)(4) provides:

(4) Payments under this subsection may be provided for a period of not to exceed eighteen months, and any period of default. Such period may be extended, in the Secretary's discretion, for not to exceed eighteen months where the Secretary has determined that such extension is necessary to avoid foreclosure and that there is a reasonable prospect that the mortgagor will be able to make the payments and repayments specified in paragraph (2) of this subsection. The Secretary shall establish procedures for periodic review of the mortgagor's financial circumstances for the purpose of determining the necessity for continuation, termination, or adjustment in the amount of the payments. Payments shall be discontinued at any time when the Secre-

---

1. The current regulations, which became effective in November, 1976 and which continue to govern operation of the assignment program, also contain the "circumstances beyond the mortgagor's control" eligibility criterion. 24 C.F.R. § 203.650(5) (1982).

2. The "reasonable prospects" criterion is also contained in the current regulations. 24 C.F.R. § 203.650(6) (1982).

tary determines that, because of changes in the mortgagor's financial circumstances, the payments are no longer necessary to avoid foreclosure or that there is no longer a reasonable prospect that the mortgagor will be able to make the payments and repayments specified in paragraph (2) of this subsection.

These limitations on assistance are structurally similar to the limitations on the period of reduced or suspended payments as outlined in the Handbook ¶¶ 5–1 and 5–3.

Repayment of assistance is covered in paragraph (a)(5). That subsection directs the Secretary to secure his assistance by a lien on the property. The Secretary is given virtually complete discretion with respect to the level of interest charged on assistance and with respect to the terms of repayment. The only restriction is a maximum limit on the interest charged on assistance; that rate may not exceed the maximum FHA interest level computed under section 203(b) of the Housing Act, 12 U.S.C. § 1709(b). Paragraph (a)(5) provides:

(5) All payments shall be secured by a lien on the property and by such other obligations as the Secretary may require. Payments shall be repayable upon terms and conditions prescribed by the Secretary, and such terms and conditions may include requirements for repayment of any amount paid by the Secretary toward a mortgagee's expenses in connection with the payment or repayments made under this subsection. The Secretary may establish interest charges on payments made under this subsection; except that such charges shall not exceed a rate which is more than the maximum interest rate applicable with respect to level payment mortgages insured pursuant to section 1709(b) of this title at the time assistance under this section is approved by the Secretary. Such charges shall be payable notwithstanding any provision of any State constitution or law or local law which limits the rate of interest on loans or advances of credit.

Finally, paragraph (a)(6) provides for repeated cycles of assistance on behalf of a mortgagor only in cases where that mortgagor has made full payments for 12 months following termination of the previous assistance. The language of paragraph (a)(6) is as follows:

(6) Payments under this subsection may be made without regard to whether the Secretary has previously taken action to avoid mortgage acquisition or foreclosure, except that payments may be provided on behalf of a mortgagor previously assisted under this section only in cases in which full mortgage payments (and any repayments to the Secretary which may have been requested) have been made by such mortgagor for at least 12 months from the time such previous assistance under this section was terminated.

As noted above, the amended version of section 230 provides for continued operation of the assignment program. Paragraph (b)(1) of the amended section now states in pertinent part:

(b)(1) When the Secretary receives notice of a default described in subsection (a)(1) of this section and makes a determination that assistance under subsection (a) of this section would be inappropriate in the case of the mortgagor, the Secretary (for the purpose of avoiding foreclosure of the mortgage, and notwithstanding the facts described in the parenthetical material contained in subsection (a)(1) of this section and the fact that payments have been made under subsection (a) of this section with respect to the mortgage) shall, if determined necessary by the Secretary, acquire the mortgage and security therefor upon payment of the insurance benefits in an amount equal to the unpaid principal balance of the mortgage plus any unpaid mortgage interest and reimbursement for such costs and attorney's fees as the Secretary finds were properly incurred in connection with the defaulted mortgage and its assignment to the Secretary, and for any proper advances theretofore made by the mortgagee under the provisions of the mortgage. After the acquisition of such mortgage by the Secretary, the mortgagee shall have no further rights, liabilities, or obligations with respect thereto.

The conditions under which assignment is now available are identical to those under the previous statute, except for the further requirement that assignments are now to be accepted only where the Secretary determines that TMAP is "inappropriate."

Paragraph (b)(2) sets out durational limits on the period of reduced or suspended payments that may be provided for mortgages accepted for assignment. The statute provides that the initial 18-month period of reduced or suspended payments may be extended by up to 18 additional months where the eligibility criteria continue to be met. *Compare* section 230(a)(4). These durational limits also parallel those in the Handbook. *See* Handbook ¶¶ 5–1, 5–3. Paragraph (b)(2) also gives the Secretary broad discretion to structure repayment plans for assigned mortgages and allows for interest on assistance but only at a rate at or below the FHA maximum. *Compare* section 230(a)(5). Paragraph (b)(2) reads as follows:

(2) The Secretary may provide assistance, to a mortgagor whose mortgage has been acquired under paragraph (1) of this subsection, through forebearance of interest or principal, or both, or through other means, for a period of not more than eighteen months after the acquisition of the mortgage, if the mortgagor has not been assisted under subsection (a) of this section within twelve months of the date of such acquisition and if the Secretary determines that there is a reasonable prospect that the mortgagor will be able to meet the conditions described in subsection (a)(2) of this section. Such period may be extended, in the Secretary's discretion, for not to exceed eighteen months where the Secretary has determined that such extension is necessary to avoid foreclosure and that there is a reasonable prospect that the mortgagor will be able to meet the conditions described in subsection (a)(2) of this section. Such assistance (which may include any expenses of the Secretary incurred in connection with providing such assistance) shall be repayable upon terms and conditions prescribed by the Secretary, except that in no event shall any interest

rate charged on such repayments exceed the interest rate chargeable for repayments of assistance made under subsection (a) of this section. Such rate shall be payable notwithstanding any provision of any State constitution or law or local law which limits the rate of interest on loans or advances of credit.

Paragraph (b)(3) of the amended statute allows the Secretary to acquire a mortgage with respect to which TMAP had been provided in order to permit extension of the mortgage term. That paragraph states:

(3) In carrying out paragraph (1), the Secretary shall, if determined necessary by the Secretary, acquire a mortgage, with respect to which assistance was being provided under subsection (a) of this section immediately prior to such acquisition, for the sole purpose of extending the term of repayment under the mortgage so that the mortgagor will be able to make the full payments on the mortgage.

The amended section 230 also contains subsections (c) and (d) relating respectively to funding for the programs and home-ownership counseling. Neither is directly pertinent to the motions before us today.

The 1980 housing amendments leave unaltered the obligatory national housing policy as stated in 42 U.S.C. § 1441. The foregoing analysis of the amendment of section 230 makes clear—and HUD does not contend to the contrary—that, with the possible exception of the limitations on subsequent assistance contained in paragraphs (a)(6) and (b)(2), the statute is not inconsistent with the continued provision of a mortgage foreclosure avoidance program as widely available and of as high a quality as the one currently in operation.

Moreover, our review of the legislative history of the 1980 amendments confirms the conclusion that Congress did not intend to cut back on the availability and quality of mortgage foreclosure avoidance assistance. Amendment of section 230 was initially proposed by HUD officials who envisioned that the suggested TMAP program would become "the predominant foreclosure

avoidance mechanism to the maximum extent possible consistent with [HUD's] ... obligations under its Assignment Program" and that it would eventually supersede the assignment program altogether. *See* HUD Proposed Legislation and Commentary at 29, 34, 39.[3] The House of Representatives did not adopt the HUD proposal and instead passed legislation substantially identical[4] to the amended version of section 230 described above. The House Proposal, H.R. 2719, specifically retained the assignment program and made no provision for that program's termination.

The House of Representatives Banking, Finance and Urban Affairs Committee Report on H.R. 7262[5] emphasized that the amending legislation was not intended to affect the viability of mortgage foreclosure avoidance relief:

> *In designing TMAP the Committee has attempted to conform as closely as possible to the existing requirements of the assignment program.* What the Committee has sought to do is assure that the assistance accorded to homeowners under both programs will be virtually the same. In essence the two approaches differ only in who actually holds the mortgage—under assignment it is the Secretary and under TMAP it is the private lender. *The Committee has taken care to assure that the current structure, requirements and approach of the assignment program will not be altered by this legislation.* [Emphasis added.]

House Report No. 96–979, 96th Cong. 2d Sess. at 53–54. According to that report, the amending legislation was intended to allow HUD to implement a lower cost alternative to the assignment program which would provide equally effective foreclosure avoidance relief. *Id.* at 51.

After passage, the House bill was apparently referred to a Conference Committee which produced the changes referred to in footnote 4, *supra.* The Conference Committee also indicated unequivocally that the purpose of the amendments to section 230 was not to make assistance under that section more difficult to obtain, but only to provide a possibly lower cost alternative to the assistance the Department was already authorized and required to provide. House Report No. 96–1420, 96th Cong. 2d Sess. at 123, U.S.Code Cong. & Admin.News 1980, p. 3506. The Conference Committee further "expect[ed] the Secretary to take steps to assure that assistance provided under TMAP [be] consistent with the relief provided under assignment, and to avoid inequities." *Id.* at 122, U.S.Code Cong. & Admin.News, p. 3667.

Following enactment, on September 30, 1980, of the amendments to section 230, HUD, on August 2, 1982, promulgated and published, *see* 47 Fed.Reg. 33242 (1982), the TMAP implementing regulations for which it now seeks our approval. The proposed new regulations provide *inter alia* for the rate and accrual date for interest charged both on TMAP and on mortgage assignment foreclosure assistance. They indicate that HUD has total discretion with respect to the level of assistance provided under both programs; they provide for determination of a date of default for purposes of establishing whether the default was the result of "circumstances beyond the mortgagor's control" and set out additional assistance eligibility requirements. The proposed regulations provide for review of the payment plans established under both programs and they establish procedures for repayment of both forms of assistance.

---

**3.** HUD has included as an exhibit to its post-trial memorandum a copy of the proposed legislation which it forwarded to Congress in February 1980.

**4.** The House of Representatives measure provided for TMAP over an 18-month period *inclusive of* the original period of default, unlike the enacted amendment of section 230, which provides that assistance may initially cover 18 months *in addition to* the default period.

The House of Representatives measure, in Section 230(b)(1), provided for assignment assistance on a finding that TMAP would be "impracticable" rather than, as in the enacted version, "inappropriate."

**5.** H.R. 7262 is identical to H.R. 2719. The bill that was reported out of Committee was renumbered on the floor of the House.

Specific objections to the proposed regulations are analyzed in detail below.

Defendants propose that the Amended Stipulation be modified to include a new paragraph 16 which would provide:

16. Nothing in this Amended Stipulation affects or interferes in anyway [sic] with the Department's implementation of the TMAP program as authorized by Public Law 96–399.

Defendants ask that they be permitted to implement the proposed regulations pertaining to TMAP and the assignment program. The modification and implementation are opposed by the plaintiffs who contend that the regulations are inconsistent with HUD's obligation under the Amended Stipulation to operate the assignment program or provide equivalent mortgage foreclosure avoidance relief. *See* Amended Stipulation ¶¶ 3, 14.

### Motion for Contempt

Before reaching the merits of the contentions with respect to HUD's future obligations, we turn to the not unrelated question, raised by the plaintiffs' pending civil contempt motion, of the satisfactoriness of HUD's performance to date under the former statutory scheme. Plaintiffs proceed in their civil contempt motion on two apparently independent theories.

Their first argument is based on the monthly statistical reports of HUD's action on mortgage assignment applications, which—they argue—show that in the period beginning in August 1981, the number of applications accepted dramatically decreased. The plaintiffs argue that this marked drop in the acceptance level constitutes clear and convincing evidence that HUD has failed to operate the mortgage assignment program in good faith in accordance with the terms of the Handbook, as the Amended Stipulation requires.

The plaintiffs' statistical evidence, which was presented at the hearing on this matter and not seriously disputed, does reveal an unpredicted and unfortunate drop in the number of mortgage assignments accepted by HUD in the seventeen month period beginning in August 1981. The plaintiffs' expert divided the monthly statistical data provided by the defendants into three time periods. The first, May 1976 through January 1979, was a period for which HUD later conceded, *see* Amended Stipulation at p. 2, that there were serious deficiencies in the administration of the assignment program. In that period, 18% of the total cases processed were accepted for assignment; in 23.1% of the cases, the application was referred to the mortgagee as a result of the mortgagee's agreement to forego foreclosure and continue the mortgage, *see* Handbook ¶ 3–6. HUD rejected the remaining 58.9% of the applications in that period.

The second period, February 1979 through July 1981, was one of relatively higher acceptances and referrals during which HUD accepted 24.7% of the total applications it received and referred 22.2% of the applications back to mortgagees. Some 53% of the total were rejected.

In the third and final period, however, beginning on August 1, 1981, the number of acceptances as well as the combined number of acceptances and referrals back to the mortgagees decreased below the level of either of the two prior periods. Through July 1982, the level of acceptances was 14.4%; that of referrals to mortgagees was 25.2%; and 60.4% of applications to the assignment program were rejected.[6]

It was undisputed at the hearing that the precipitous decline in the level of mortgage assignments was no accident. The defendants' own expert testified that the likelihood of the drop having occurred merely by chance was on the order of one in one decillion. (Tr. 335) Plaintiffs argue that, because some non-random factor has caused HUD's mortgage assignment rate to slip dramatically below even the level prior to the Amended Stipulation, the defendants, in order to avoid contempt citation, should

---

**6.** Since the hearing, HUD has continued to submit monthly statistical reports on its acceptance rates and statistics are now available through December 1982. The rates for the period August 1981 through December 1982 are: acceptances, 14.9%; referrals to mortgagee, 24.7%; and rejections, 60.5%.

be required to show that the lower rate is not the result of their violation of the Stipulation.

That theory of statistical burden shifting is premised on several of the Supreme Court's discrimination cases, which, the plaintiffs argue, are authority for the proposition that the statistical disparity between the third and the earlier two periods establishes a "prima facie case" that HUD violated the Amended Stipulation, shifting the burden to HUD to articulate or show a permissible basis for the drop. *See generally International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 334–43, 97 S.Ct. 1843, 1854–59, 52 L.Ed.2d 396 (1977); *Hazelwood School District v. United States,* 433 U.S. 299, 306–13, 97 S.Ct. 2736, 2740–44, 53 L.Ed.2d 768 (1977); *Castaneda v. Partida,* 430 U.S. 482, 486–97, 97 S.Ct. 1272, 1275–82, 51 L.Ed.2d 498 (1977).

The applicability of these cases to this motion for civil contempt is problematic. We may not hold HUD in contempt of our November 1979 order absent proof by clear and convincing evidence that HUD violated a valid and unambiguous requirement of the Amended Stipulation or the Handbook. *See, e.g., Shakman v. Democratic Organization of Cook County,* 533 F.2d 344, 351 (7th Cir.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976); *Vertex Distributing Inc. v. Falcon Foam Plastics, Inc.,* 689 F.2d 885, 892 (9th Cir.1982); *United States v. Greyhound Corp.,* 363 F.Supp. 525, 570 (N.D.Ill.1973), *aff'd,* 508 F.2d 529 (7th Cir. 1974). And there is substantial question in our mind whether this standard can be satisfied solely by the level of statistical proof that the plaintiffs have introduced here.

*Equal Employment Opportunity Commission v. Plumbers' Union No. 38,* 28 Fair Empl.Prac.Cas. (BNA) 1567 (N.D.Cal.1981), *remanded,* 676 F.2d 709 (9th Cir.1982), to which the plaintiffs have directed our attention, involved proof relating to a consent decree in an employment discrimination case that required indenture of a set quota of minority apprenticeship applicants. *Plumbers' Local* is therefore not authority for the propriety of inferring from the statistical proof that the Amended Stipulation, which set no quotas or acceptance requirements, was violated. *See also Aspira of New York, Inc. v. Board of Education of the City of New York,* 423 F.Supp. 647, 651 (S.D.N.Y.1976) (failure to meet goals set by consent decree not grounds for holding defendants in contempt absent specific evidence of defendants' indifference to the decree) (dicta).

At the hearing, the plaintiffs sought to correlate the abrupt decline in the level of acceptances to an August 1981 HUD decision to tighten up on application of the assignment eligibility criteria. They introduced a memorandum or telegram from HUD's Washington, D.C. office to its field office personnel, dated August 5, 1981—a date that roughly coincides with the beginning of the plaintiffs' third period—which lamented the high number of defaults and foreclosures of HUD-assigned mortgages. That memorandum stated that "[t]he high default and foreclosure rate leads to a conclusion that the local offices have misinterpreted and/or misapplied the assignment eligibility criteria in a great many cases." And the memorandum went on to instruct Field Office personnel to use income before default rather than at the time of application to measure eligibility for assistance; to require positive evidence of ability to satisfy the reasonable prospect of ability to pay criterion; and, in general, to place the burden "on the mortgagor to establish that each of the [eligibility] criteria has been met rather than on the Field Office to establish that it has not been." These procedures, the memorandum stated, represented no change in policy from that announced in the Handbook and incorporated in the Amended Stipulation in this case.

Even assuming that the August 5, 1981 memorandum was the direct cause of the decline in the percentage level of assignments,[7] that memorandum is not direct evi-

---

**7.** HUD's statistical expert testified that, on his interpretation of the statistical data, the downward trend in the level of acceptances actually began much earlier than the plaintiffs had surmised—in July 1980—from which it would follow that the August 1981 memorandum did not precipitate a trend. *See* Tr. at 319–20; Defendants' Exhibit # 5.

dence that HUD has violated the terms of the Amended Stipulation or of the Handbook. It is clear that beginning at least as early as August 1981, HUD wished to limit access to the assignment program. To that end, the Department decided to reverse the presumption of eligibility for the program and to require strict proof of eligibility. But the plaintiffs have not demonstrated or even suggested that HUD's actions in this regard violated clear and unambiguous directives in the Amended Stipulation or the Handbook.

The plaintiffs suggest that we should infer wrongdoing from the fact that the percentage level of mortgages assigned to HUD during the third period, 14.4%, is actually lower than the initial period level of 18%. In the initial period, there was concededly a "significant incidence of error in the administration of the program." Amended Stipulation at p. 2. And for the assistance level now to have decreased below that of the initial period in this subsequent period of record levels of unemployment and other economic hardship beyond many mortgagors' control, is exactly the reverse of what we would have expected.

However, as the defendants properly emphasize, the Amended Stipulation does not require and the plaintiffs have not demonstrated that there is a "normal" level of acceptance of mortgage assignments that is associated with HUD's compliance with the consent decree. It is readily apparent that HUD is accomplishing far less than the terms of the Handbook and the Amended Stipulation would allow it to or than we believed would be accomplished. It is lamentable from our point of view, and no doubt acutely painful to rejected mortgagors who have lost their homes as a result, that HUD has chosen not to pursue the full extent of relief that is permissible under the Handbook and the Amended Stipula-

tion. Once again, HUD has violated the spirit, if not the letter, of its representations to and agreements with the plaintiff class and the Court.

Our surprise and disappointment at the statistical developments and HUD's performance or lack thereof may not, however, form the basis for a finding that HUD failed properly to apply the eligibility criteria in the absence of proof that any specific provision of the Handbook was violated. We conclude, therefore, that HUD may not be held in contempt by virtue of the unfortunate decline in its mortgage assignments. This is not to suggest, however, that a further reduction in the number of assignments accepted may not require a showing by HUD that such a reduction was not the result of contemptuous conduct.

█ The plaintiffs' second and apparently unrelated[8] ground for holding HUD in contempt, which is directed to the level of assistance provided to those mortgagors who are accepted into the program, also gives us pause. The plaintiffs argue that the Handbook requires HUD to limit the mortgage payments that it requires on mortgages that have been assigned to it to a level such that not more than 35% of the mortgagors' net effective income during the course of their payment programs is allocated to housing expense. This so-called "35% rule" is certainly a sensible one in light of the purpose of the assignment program to provide temporary relief from onerous mortgage payments, and, as we stated at the hearing (Tr. 365), it had been our understanding at the time we approved the Amended Stipulation that the rule would apply to all payment plans. The plaintiffs apparently had that understanding as well. (Tr. 368)

Chapter 5 of the Handbook, which sets out the required policy with respect to for-

---

8. The statistical fluctuations on which the first of plaintiffs' contempt theories was based gave rise to allegations of misapplication of the assignment eligibility criteria. The alleged failure to apply a "35% rule" in establishing payment plans for accepted mortgagors is logically unrelated to the level of acceptances. We speculated at the hearing that mortgagors who learned

they would be required to pay a huge fraction of their income to HUD may well have decided to forego HUD's offer of "assistance." (Tr. 378–79) In practice, HUD's interpretation of its obligations—or lack thereof—with respect to formulation of payment plans may in fact be related to the decline in acceptance. No evidence was presented on this point, however.

mulation of repayment plans, does not, however, appear to require a ceiling of 35% of net effective income in all cases. In a first paragraph, 5–1, labeled "General," chapter 5 provides in part:

When developing payment plans, the Field Office must strike a balance between the current financial ability of the borrower and the need to pay the mortgage in full. If a mortgagor cannot immediately resume payments in the amount that will enable him/her to pay the mortgage in full by the maturity date, the Field Office may initially reduce or suspend payments for up to 18 months and may extend the maturity date of the mortgage by up to 10 years so as to reduce the monthly payment that would be required to pay the mortgage in full. A payment plan may be extended beyond 18 months only under unusual circumstances.

Paragraph 5–4 then describes how to arrive at the "Payment Amount"; in part, it provides:

The Loan Specialist should develop a payment plan that, given the financial ability of the mortgagor, will enable the mortgagor to clear the delinquency as soon as possible and pay the mortgage in full. The Field Office is given broad discretion to tailor the payment program to individual needs. In addition, when the mortgagor is able to resume full monthly payments the Field Office may recast the mortgage and extend the term by up to ten years so as to reduce the monthly payment to an affordable amount.

a. During the period of reduced or suspended payments, the monthly payment demanded by the Field Office shall not cause the mortgagor's total housing expense to exceed 35 percent of net effective income. . . .

b. After a period of reduced or suspended payments or in order to cure a default under an existing payment program, the Field Office should develop a repayment program that will enable the mortgagor to reinstate the mortgage and pay the mortgage in full by its maturity date, or a date not more than 10 years after the ma-

turity date. If the monthly payment required to pay the mortgage in full by the present maturity date plus 10 years . . . is less than or equal to 35 percent of the mortgagor's net effective income less other housing expense . . . a period of reduced or suspended payments may not be needed.

These provisions are full of discretionary language. Paragraph 5–1, for example, does not require a period of reduced or suspended payments in every case. By the terms of paragraph 5–4(a), the 35% rule applies only in those cases where HUD has previously determined, in its discretion, that the mortgagor should be allowed a period of reduced or suspended payments and then only for the duration of that period of reduced or suspended payments. Although subparagraph 5–4(b) implies that something like a 35% rule will be applied to determine whether a period of reduced or suspended payments is to be allowed in a particular case, the language of that subparagraph as well is entirely discretionary.

The plaintiffs argue that it is to be expected that a mortgage assignment program whose avowed purpose is "to give financially distressed mortgagors an opportunity to avoid foreclosure and retain their homes," Handbook ¶ 1–1, would provide a period of reduced or suspended payments in every one—or all but a few—of the cases accepted for assignment. Plaintiffs therefore conclude that the 35% rule contained in Handbook ¶ 5–4 should apply in virtually every case. These suppositions—and that is essentially all they are—appear logical to us as well.

In practice, however, HUD's monthly statistical reports and the uncontroverted testimony at the hearing (Tr. 222–25) reveal that over 50% of the payment plans call for payments at the original note rate or higher. It was also conceded that a substantial number of the mortgagors accepted by HUD for assistance are never allowed a temporary period of reduced or suspended mortgage payments. (Tr. 453) HUD maintains that in those cases, the circumstances that led to default had already been cured

by the time HUD accepted assignment of the mortgage. By the clear terms of the Handbook, mortgagors who are deemed not in need of a period of reduced or suspended payments are not entitled to specific consideration of their available income in HUD's determination of their payment plan.

It seems obvious that a mortgage payment plan which requires allocation of over 35% of the mortgagor's net effective income to housing expense is one that is likely to end in default and foreclosure. We are astonished at HUD's apparent policy routinely to permit or require such payment plans to go into operation. And we are not at all surprised to learn, in light of that apparent policy, that by HUD's own reckoning—as expressed both in the August 5 memorandum and at the hearing—the rate of defaults and foreclosures of HUD assigned mortgages has been inappropriately and unfortunately high. (Tr. 423–26)

HUD's cavalier and taciturn response— that "nothing requires" it to apply the 35% rule to all payment plans—surprises us in light of HUD's prior representations to us and its undeniable obligation to operate its foreclosure avoidance program so as to fulfill a National Housing Act policy of providing a decent home and suitable living environment for every American family. *See* 42 U.S.C. § 1441. That statutory obligation was imposed by the Congress and confirmed by us in an earlier opinion in this case, *Brown v. Lynn, supra,* and the obligation is now no longer open to question. *See United States v. Winthrop Towers,* 628 F.2d 1028, 1032 (7th Cir.1980). In light of that obligation, we would have expected that HUD would, at a minimum, provide some justification for its apparent conclusion that requiring mortgagors to allocate in excess of 35% of net effective income to housing expense in fact advances that national housing policy.

Although we are dismayed at HUD's obvious lack of enthusiasm for achievement of the national housing goals as established by the Congress, we are able to discern in the Handbook only the clear requirement—with which HUD asserts it has complied—that the 35% rule be applied only during the period of reduced and suspended payments

allowed for certain eligible mortgagors. We therefore cannot find HUD in civil contempt for having apparently limited its application of that rule. We reach that conclusion with considerable regret, because we believe the 35% rule is a sound one in all cases and we were previously led to believe that HUD agreed. The rule appears entirely consistent with the broad national housing policy to which we have referred above as well as with the purposes of the Amended Stipulation and we would have hoped that HUD would have applied it to all repayment plans. However, our views on the compatibility of the 35% rule with these goals and purposes are no basis for a finding of contempt under the Amended Stipulation. *Cf. Hughes v. United States,* 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1952). Again, however, HUD has demonstrated that it will resolve any ambiguity so as to restrict or limit the relief it affords a mortgagor and make default and foreclosure more likely.

### Modification of the Amended Stipulation to Permit Implementation of the Proposed TMAP Regulations

We turn now to HUD's motion to modify the Amended Stipulation to allow implementation of the proposed TMAP regulations—and to the prospects for future provision of mortgage foreclosure avoidance relief.

As quoted above, the Amended Stipulation now requires, in paragraph 3, the operation through August 1984 of a mortgage assignment program in accordance with the "binding instructions" contained in the Handbook. Any modifications in the program must preserve the "basic rights" accorded mortgagors under the Handbook now in effect. Furthermore, HUD is obliged by paragraph 14 of that Amended Stipulation, even after the termination of its specific obligations, to provide foreclosure avoidance relief for mortgagors in temporary financial distress that is consistent with HUD's obligations as construed under the National Housing Act, as amended, Section 2 of the Housing Act of 1949

and Section 2 of the Housing and Urban Development Act of 1968. Paragraph 14 further provides: "the Department shall provide assistance or relief *in the form of the present assignment program or an equivalent substitute* to permit mortgagors in default on their mortgages to avoid foreclosure and to retain their homes during periods of temporary financial distress." [Emphasis added.]

Our previous discussion of the 1980 amendments makes clear that the statutory underpinning of the Amended Stipulation is fundamentally unchanged. In essence, the effect of the amendments is to permit HUD to use alternative means for providing equivalent foreclosure avoidance assistance. HUD may now assist mortgagors in temporary financial distress by providing TMAP as well as—in those cases where TMAP is "inappropriate"—by acquiring the mortgage and forbearing to collect full or immediate payments. It is clear that, while HUD sought legislation under which it could have made TMAP the sole foreclosure avoidance procedure, the intention and effect of the 1980 amendments as enacted was to leave unaltered the availability and quality of existing mortgage foreclosure avoidance assistance.

■ Further, we have no difficulty in concluding that the effect of those provisions of the Amended Stipulation that we have set out above is also to require that the TMAP program be implemented in a manner which will provide foreclosure avoidance relief as nearly equivalent to that available under the assignment program as is consistent with the amended statute. We are bound to construe the Amended Stipulation not with narrow, mechanical reference to its letter alone, but in light of its spirit and purposes. *See White v. Roughton,* 689 F.2d 118, 119–20 (7th Cir.1982). And the undeniable purpose of paragraphs 3 and 14 of the Amended Stipulation—though neither paragraph explicitly addresses the unanticipated and undisclosed contingency of a possible amendment of section 230 within the five-year period for which the Handbook is binding—is to require, so long as provided for by statute, mortgage foreclosure avoidance assistance

of at least as high a quality as that provided for in the Handbook. In paragraph 14 the defendants promised—even *after* August 2, 1984—to provide foreclosure avoidance relief at least equivalent to the Handbook's assignment program, a promise or obligation which the 1980 amendments can only be said to have ratified and underscored.

■ It follows from this that the defendants' proposed modification to the Amended Stipulation, which would permit them to operate the TMAP program without reference to HUD's obligations under the Amended Stipulation as agreed to and approved in 1979 and to be free of judicial oversight, is unacceptable. *System Federation No. 91, Railway Employees' Department, AFL–CIO v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), and *State of Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856), on which the defendants rely, do not mandate a different result. While a change or development in the law underlying the Amended Stipulation would oblige us to make conforming modifications in that Stipulation, it is clear that there has been no such change.

Far from discerning any "necessary implication" in the 1980 amendments or their legislative history that the Amended Stipulation should not govern the operation of TMAP, we are satisfied that Congress wished the provision of mortgage foreclosure avoidance relief to continue unaltered and did not intend the amendments to supersede the Amended Stipulation's requirement that HUD continue to provide relief "equivalent" to the mortgage assignment program. In light of HUD's prior performance, Congress wisely did not give HUD discretion to substitute TMAP for its obligations under the Amended Stipulation. Under these circumstances, there is no basis for modifying the Amended Stipulation so as to permit HUD to operate TMAP without reference to its obligations under the Amended Stipulation. *See Environmental Defense Fund, Inc. v. Costle,* 636 F.2d 1229, 1241 (D.C.Cir.1980).

■ Nor do we accept the plaintiffs' argument that the Amended Stipulation prohibits implementation of *any* TMAP program. The plaintiffs appear to rely on paragraph 3 of the Stipulation which provides in part that the Handbook "shall constitute binding instructions for implementation of the assignment program" and that HUD "shall administer the assignment program substantially in accordance with the terms of [the] Handbook." Plaintiffs also point to those portions of section 230 that undeniably grant HUD discretion to continue operation of the assignment program.

If there is any basis in the language of the Amended Stipulation for concluding that it requires that the assignment program be the sole or exclusive form of mortgage foreclosure avoidance relief, a conclusion with which we do not agree, then the 1980 amendments to section 230 would contravene and supersede such a limitation. The amendments to section 230 accord HUD permission to operate a TMAP program as well as an assignment program so long as there is no reduction in the availability and quality of mortgage foreclosure avoidance assistance. Given this legislative grant of permission, we may not now refuse to allow implementation of a TMAP program in a fashion consistent with the unaltered purposes of the‧ statute and the Amended Stipulation. *See System Federation No. 91, supra,* 364 U.S. at 646–48, 81 S.Ct. at 370–72.

■ With these principles in mind, we turn to the regulations that HUD has proposed and now seeks to implement.[9] As is apparent from the foregoing, our analysis must determine whether the proposed regulations protect the basic rights secured to eligible mortgagors by HUD's former commitment to operate its mortgage foreclosure avoidance program in accordance with the Handbook. Simply stated, if the proposed regulations do not preserve the availability and quality of foreclosure avoidance assistance now provided for under the Handbook to the maximum extent that such preservation is permissible under amended section 230, then they are inconsistent with the Amended Stipulation and may not be implemented.

We emphasize that the plaintiffs have not suggested, and the issue before us is not merely whether, the HUD-proposed regulations are inconsistent with section 230 as amended and invalid for that reason alone. If that were the only issue before us, we would agree with HUD's position that appropriate deference should be accorded to HUD's interpretation and construction of the statute which it is charged with administering and we would not hesitate to uphold the regulations if they were consistent with a fair, non-arbitrary reading of the rule-making authority vested in HUD by section 230. *See Federal Communications Commission v. Schreiber,* 381 U.S. 279, 288– 94, 85 S.Ct. 1459, 1466–70, 14 L.Ed.2d 383 (1965); *McElrath v. Califano,* 615 F.2d 434, 439 (7th Cir.1980). But in this case, HUD is required to do more than merely promulgate regulations that are consistent with the statute. Except insofar as the statute clearly contemplates the contrary, HUD must also achieve its obligations under the Amended Stipulation, to which it obviously still remains subject. With respect, in light of the foregoing, HUD's substantial failure to address in its briefs the effect of certain of the proposed regulations on its obligations under the Amended Stipulation is an anomalous or even ominous omission.

■ The plaintiffs argue that there are numerous features of the proposed regulations that will unnecessarily render the terms of foreclosure avoidance assistance more onerous for mortgagors or restrict the availability of such assistance. Three of plaintiffs' objections relate to the proposed provisions for the interest rate, date of interest accrual and repayment of assistance with respect to the TMAP and mortgage assignment programs. The proposed TMAP regulation would read:

---

**9.** HUD argues that we may avoid this inquiry. It suggests that the House and Senate Banking Committees' failure to invalidate the proposed regulations when they were transmitted to those Committees pursuant to 42 U.S.C. § 3535(*o*), constitutes legislative acquiescence in the view that the proposed regulations further the intent of section 230. HUD's position is patently without merit. *See* 42 U.S.C. § 3535(*o*)(5).

(a) Upon termination of TMAP, all TMAP made by the Secretary, together with interest accrued thereon from the dates of TMAP made by the Secretary at the maximum interest rate allowed under § 203.20 at the time the Secretary determines that the mortgagor is eligible for TMAP shall be immediately due and payable unless, pursuant to paragraph (b) below, the Secretary enters into one or more forbearance agreements.

(b) After termination of TMAP, the Secretary may enter into one or more forbearance agreements to postpone repayment of all or part of the TMAP, providing for monthly payments by the mortgagor:

(1) In an amount as the Secretary determines upon an examination of the mortgagor's financial condition and circumstances, and the mortgagor's ability to contribute to the mortgage payments.

(2) In such other amount or amounts as may be prescribed by regulation at the time of execution of any forbearance agreement.

24 C.F.R. § 203.644 [proposed].

And the proposed mortgage assignment regulation provides:

(a) Upon termination of the period of forbearance assistance the mortgagor shall repay to the Secretary all amounts forborne with interest thereon accrued and payable in accordance with the terms of the mortgage instrument.

(b) The mortgagor shall pay to the Secretary each month until the payments on the mortgage are current an amount based upon an examination of the mortgagor's financial condition and circumstances, and the mortgagor's ability to contribute to the mortgage payments. However, the repayment amount may not be less than the mortgagor's total payment to principal, interest, taxes, hazard insurance, mortgage insurance premiums, assessments, and ground rents.

24 C.F.R. § 203.649 [proposed].

Plaintiffs argue first that the rate of interest charged on TMAP—which under § 203.644(a) is the maximum allowed FHA rate, 13.5% at the time of the hearing—is likely to be greater than the interest currently charged on the "amount forborne" under the Handbook assignment program, which, by HUD's account, is the same interest rate as that on the mortgage itself. *See* Handbook, Appendix 29. (Tr. 458) Plaintiffs contend that, particularly with respect to older mortgages, the mortgage note rate will be lower than the current FHA maximum. The effect of this, the plaintiffs argue, is to restrict availability of mortgage foreclosure avoidance assistance.

At the hearing, the plaintiffs introduced expert testimony that an increased interest rate would result in substantially increased payments during the repayment period. (Tr. 110–16) The effect of the higher payments, it was charged, is to diminish the likelihood or "reasonable prospect" that a mortgagor will be able to make full repayment and, therefore, to adversely affect eligibility for the program. (Tr. 116–17) In addition, it would be likely to produce a higher rate of future defaults and foreclosures.

HUD counters that, because of currently declining interest rates, the mortgage note interest rate may often in fact be higher than the FHA maximum with the result that the proposed TMAP regulations actually will work a benefit to mortgagors in many cases. HUD also presented expert testimony at the hearing and HUD's expert emphasized that most mortgage defaults occur during the first two years in the life of the mortgage. (Tr. 459) Because of the combination of currently declining interest rates and unusually high interest levels over the past two years, the expert suggested that most HUD-assisted mortgagors will be benefited by the proposed TMAP interest formula. These conclusions were, in turn, challenged by plaintiffs' expert who reasoned that the current unusually severe economic conditions may actually result in a higher than normal incidence of default on relatively elderly mortgages with interest rates well below the current FHA maximum. (Tr. 185–86)

We obviously cannot determine—either for current conditions and trends or for the

future—whether the note rate or the FHA maximum rate would be more beneficial to the greater number of mortgagors. Our concern is only that mortgagors assisted under the new statutory scheme receive an interest rate on assistance that is as low as the one required by the Amended Stipulation and at least as low as the statutory maximum.

It is clear that, with the enactment of the 1980 amendments to section 230, the interest rate charged on any form of assistance may never exceed the current FHA maximum. *See* section 230(a)(5) and (b)(2). The HUD-proposed maximum FHA interest rate is not required by the amended statute; HUD has merely chosen in the TMAP regulations to adopt the maximum interest rate that amended section 230 will permit. What is more, the current Handbook practice is to charge an interest rate that would be lower than the FHA maximum in those cases where the mortgage note rate is in fact lower than the current FHA rate.

It follows, and we conclude, that the combined—and consistent—effect of the amendments to section 230 and the Amended Stipulation is to prohibit HUD from charging interest on assistance greater than the lower of the mortgage note rate or the current FHA maximum allowable interest rate. Only if HUD is required to adhere to that rule will mortgagors have the benefit of both the statutory ceiling on the allowable interest rate and the full relief available under the Handbook. Because the proposed regulations do not require HUD to charge the mortgage note rate on TMAP assistance when that is lower than the current FHA maximum, they fail to preserve basic rights available under the Amended Stipulation.

HUD suggests, however, that under the proposed regulations it has, in effect, discretion to charge the mortgage note interest rate in cases where that is lower. Specifically, HUD appears to suggest that, because the proposed regulations for mortgage assignments in § 203.649(a) call for interest equal to the mortgage note rate, HUD may simply exercise its discretion to determine that TMAP is "inappropriate" in a case where the note rate is lower than the FHA maximum, and accept a mortgage as-signment instead, thereby precluding any variation between the terms of the proposed TMAP program and the Handbook's assignment program.

While this is possible, we are not confident that HUD will in fact exercise its discretion to accept a mortgage assignment under these circumstances. The provision of the proposed regulations concerning an administrative finding that TMAP is "inappropriate" makes no reference to a disparity in interest rates or to the relative difficulty of obtaining assistance under the regulations and statutory provisions relating to the TMAP and assignment programs, respectively. The proposed regulations only provide that TMAP is "inappropriate" (1) where the mortgagee refuses to accept TMAP on behalf of an eligible mortgagor (2) where the mortgagee is unwilling to extend the mortgage term and extension is necessary for the mortgagor to afford repayment and (3) where, for reasons beyond his control, the mortgagor is unable to execute the necessary TMAP documents. The proposed regulation on inappropriateness would provide:

(a) The Secretary will accept an assignment of a mortgage which meets the conditions of § 203.640(a)(1) through (6) if determined by the Secretary to be necessary to avoid foreclosure and if the Secretary determines that TMAP would be inappropriate in the case of the mortgagor. In applying § 203.640(a)(4) the term "assistance" is deemed to refer to forbearance assistance pursuant to § 203.646. Among other grounds, TMAP shall be determined to be inappropriate if the mortgagee refuses to accept TMAP or if extension of the mortgage maturity (by not more than 10 years after the original maturity) would be necessary in order for the mortgagor to afford repayment and the mortgagee is unwilling to do so. If a mortgage is found ineligible for TMAP due to the mortgagor being unable to execute the documents required by the Secretary to assure repayment of the TMAP (§ 203.640(b)(7)), an assignment will be accepted where the inability is caused by circumstances beyond the mortgagor's control.

(b) A mortgage shall not be eligible for assignment in any case where:

(1) The mortgaged property has been abandoned, or has been vacant for more than 60 days, or

(2) The mortgagor, after being clearly advised of the options available for relief, has clearly stated in writing that he/she has no intention of fulfilling his/her obligation under the mortgage, or

(3) The mortgagee is prevented by law from initiating foreclosure of the mortgage, or

(4) The mortgagor owns two or more properties occupied by tenants who are paying rent, and the rental income is not being applied to the mortgage under review, or

(5) TMAP have been paid on behalf of the mortgagor within twelve months of the date of the assignment request to the Secretary, except that the Secretary may accept assignment of a mortgage with respect to which TMAP were made immediately prior to the assignment for the sole purpose of extending the term of repayment under the mortgage so that the mortgagor will be able to make the full payments on the mortgage; or

(6) The property is owned by a partnership or corporation, or

(7) TMAP were not provided because the mortgagor was unwilling to execute the documents required by the Secretary to assure repayment of the TMAP.

24 C.F.R. § 203.645 [proposed].

What is more, HUD's performance under the Amended Stipulation to date gives us reason to be skeptical of its current assurances that it will exercise "discretion" to find TMAP inappropriate in a fashion that will facilitate foreclosure avoidance assistance equivalent to the Handbook. Under the Amended Stipulation, HUD has consistently, it appears, exercised its discretion in precisely the opposite direction—to limit access to the assignment program and to limit the level of assistance provided.

Moreover, since HUD has made it clear that it intends to utilize TMAP wherever possible so as to reduce its current expenditures and would have endeavored to replace

acceptance of mortgage assignments entirely with TMAP if Congress had authorized it to do so, it seems unlikely, if not inconceivable, that HUD would find TMAP inappropriate solely on the ground that it desired to give a mortgagor the benefit of a lower interest rate. We therefore have no reason to rely on HUD's assurances that it will exercise its discretion in a manner that will maximize—not minimize—access to assistance under its foreclosure avoidance relief operations. On the contrary, given HUD's consistent practice of resolving all doubts as to its obligations against a mortgagor, we must assume that any discretion given HUD or any ambiguity in the TMAP regulations will be similarly utilized.

Nor are we moved by HUD's assurances that it will exercise its discretion under proposed § 203.644(b) to enter into forbearance agreements with the effect—it is implied—of eliminating the adverse affect on eligibility of possibly higher interest charges by allowing mortgagors to repay TMAP assistance after the mortgage is retired. HUD has nearly absolute discretion under proposed § 203.644(b) with respect to forbearance agreements and there is no indication in the record of this case or requirement in the regulations themselves that HUD will exercise that discretion in the manner suggested. The proposed regulations do not clearly provide that mortgage foreclosure avoidance assistance shall be subject to an interest rate no higher than that currently charged on assistance provided under the Handbook. Those regulations therefore denigrate "basic rights" under the Handbook, do not provide for an "equivalent" form of foreclosure avoidance assistance, and may not, consistent with the Amended Stipulation, be implemented.

■ The plaintiffs' second attack on the above-quoted provisions of the proposed regulations concerns their alleged inconsistency with the current Handbook procedure of not charging interest on the amount of forbearance until after the period of reduced or suspended payments. See Handbook, Appendix 6. The proposed regulations provide that interest will begin to

accrue on the amount of assistance payments or forbearance as of the dates thereof. HUD does not suggest that the plaintiffs have misstated the practice of forgiveness of interest under the current Handbook or misconstrued the intent and effect of the proposed regulations.

The imposition of an additional interest obligation on assisted mortgagors—one that is not required and, in all probability, not contemplated by the amendments to section 230, *see* Section 230(a)(5) and (b)(2)—results in a more onerous payment burden for those assisted, more probability of future default and foreclosure, and may also limit eligibility for assistance because higher repayment obligations may preclude certain mortgagors from satisfying the "reasonable prospect" criterion. Therefore, insofar as §§ 203.633 and 203.649 require interest on assistance to accrue from the date of the assistance, those sections of the proposed regulations do not preserve basic rights under the Amended Stipulation and may not be implemented.

█ Third, the plaintiffs contend that the proposed regulations are inconsistent with the Handbook because they require, with respect to TMAP, that the full TMAP assistance is due and payable immediately after TMAP assistance is terminated, § 203.644(a), and, with respect to mortgage assignment, that the "foreborne amount" is due after the termination of mortgage assistance in an amount determined by HUD, § 203.649.

Under the current Handbook ¶ 5–4(b), as implemented by Appendix 6, HUD is required to develop a repayment program that will allow an assisted mortgagor to retire the mortgage by the original maturity date extended, if necessary, by up to 10 years. In practice, the HUD Payment Plan Worksheet, Appendix 6, allows for only two methods for structuring repayment. And under each of them, the repayment of assistance is prorated or amortized over the life of the mortgage, which may be extended, in HUD's discretion, by up to 10 years. Section 230 as amended, *see* Section 230(a)(5) and (b)(2), grants the Secretary broad discretion in structuring repayment

plans under both the TMAP and the assignment programs; continuation of the present practice of prorating repayment of assistance over an extended mortgage term is not inconsistent with the amended statute.

It is, of course, correct that under the proposed regulations HUD is to examine the mortgagor's financial circumstances and ability to contribute to the mortgage payments in determining how to structure repayment of the forborne amount under the proposed assignment program or whether to enter a forbearance agreement under the TMAP program. There is nothing in the proposed regulations to circumscribe HUD's discretion with respect to this examination, however. And there is therefore nothing to prevent HUD from requiring repayment on terms *even more onerous* than proration over the original term of the mortgage which is the most severe repayment schedule, following a period of forbearance, which HUD may now require under the Handbook ¶ 5–4(b) and Appendix 6.

As we have said before—and it is an observation that deserves emphasis—we have ample reason to believe, in light of past performance, that, given discretion to require assistance repayment terms more onerous than under the Handbook, HUD will, in many instances, do so. Thus, because the proposed regulations give HUD virtually unfettered discretion with respect to the timing and amount of required assistance repayments, the proposed regulations are inconsistent with the Amended Stipulation and may not be implemented.

█ The plaintiffs have also drawn our attention to the sections of the proposed regulations that concern the level of assistance provided under TMAP and the proposed assignment program respectively. They provide:

Monthly TMAP on behalf of a mortgagor may be in an amount as the Secretary determines based upon an examination of the mortgagor's financial condition and circumstances, and the mortgagor's ability to contribute to the mortgage payments. However, monthly TMAP may

not exceed the mortgagor's total payment to principal, interest, taxes, hazard insurance, mortgage insurance premiums, assessments and ground rents.

24 C.F.R. § 203.641(a) [proposed].

The Secretary will provide assistance to a mortgagor whose mortgage has been assigned under § 203.645, through forbearance, in an amount based upon an examination of the mortgagor's financial condition and circumstances, and the mortgagor's ability to contribute to the mortgage payments. However, the forbearance amount may not exceed the mortgagor's total payment to principal, interest, taxes, hazard insurance, mortgage insurance premiums, assessments and ground rents.

24 C.F.R. § 203.646 [proposed].

We have previously considered at some length the level of assistance currently available under the Handbook. And we concluded that, while the intent of the Handbook is not altogether clear, the so-called 35% rule—reflecting the maximum payment a mortgagor could be required to make and, therefore, the level of assistance—clearly applied only during the period of reduced or suspended payments allowed for those mortgagors lucky enough to have been found entitled to such a period.

A cursory glance at the proposed sections of the regulations quoted above reveals that HUD now proposes to jettison the 35% rule altogether and not to be bound by it even during the actual forbearance or assistance period as Handbook ¶ 5–4(a) now clearly requires. There is nothing in the amendments to section 230 to suggest that this result is required or even contemplated. While we noted above that HUD's limited application of the 35% rule results in more defaults and foreclosures than we had expected or hoped would occur under the Amended Stipulation program, it hardly follows that we—or the affected mortgagors—would be just as content to have the 35% rule disappear altogether. The failure to provide even a limited 35% rule, consistent with the clear requirement of Handbook ¶ 5–4(a), can only further increase the incidence of default and foreclosure. And

that failure also renders the proposed regulations inconsistent with the Amended Stipulation and constitutes an additional reason why they may not be implemented.

■ The plaintiffs raise three inconsistencies of the proposed regulations with provisions of the regulations under which the assignment program currently operates. These current regulations are, of course, part and parcel of the "present assignment program" that HUD is required at least to equal in any future foreclosure avoidance programs that it may operate, see Amended Stipulation ¶ 14, and HUD may not modify these regulations unless the modification preserves the current quality and availability of assistance. We therefore turn to the plaintiffs' arguments that the proposed regulations, in certain respects, reduce the availability and level of foreclosure avoidance assistance provided for by the current regulations.

As described earlier, amended section 230(a)(1) codifies the Handbook rule, Handbook ¶ 2–1(d), that only mortgagors who have defaulted due to circumstances beyond their control are eligible for assistance. The plaintiffs also object to the proposed formula for determining "date of default" for purposes of applying this eligibility criterion. Under the current assignment program, pursuant to 24 C.F.R. § 203.330, the date of default is determined as follows:

A mortgage account is delinquent any time a payment is due and not paid. If the mortgagor fails to make any payment, or to perform any other obligation under the mortgage, and such failure continues for a period of 30 days, the mortgage shall be considered in default for the purposes of this part.

The plaintiffs suggest—and HUD in its response does not dispute the point—that the effect of the current Handbook wording is to allow a mortgagor, in effect, to cure a default by making payment of a delinquent amount after the month in which payment is due. The parties apparently agree that under the current regulation, a mortgagor who brought his account current by making his March 1 payment on March 3, who then

made the April 1 payment on May 2 and the May 1 payment on June 2, but who thereafter made no payments, would be in default, for purposes of the eligibility determination, on June 1.

The proposed regulations provide:

(a) The Secretary may make temporary mortgage assistance payments (TMAP) to the mortgagee on behalf of a mortgagor who owns the property, when the following conditions are met:

\* \* \* \* \* \*

(3) The mortgagor's default has been caused by circumstances beyond the mortgagor's control which rendered the mortgagor temporarily unable to correct the delinquency within a reasonable time and to make full mortgage payments. For the purpose of evaluating this criterion, the date of default shall be 60 days following the first day of the most recent month in which the mortgagor made a payment(s) within the month due which brought the account current. Payments made by the mortgagor after the date of default which are insufficient to bring the account current will not change the date of default.

24 C.F.R. § 203.640(a)(3) [proposed].

The effect of the proposal, plaintiffs point out, is adversely to affect the eligibility chances of mortgagors who have fallen a payment behind on their mortgages and who, despite making regular payments, have failed to become current. Plaintiffs raise the case of a homeowner who makes his January 1 payment on January 6, his February 1 payment on March 6, his March 1 payment on April 10 and his April 1 payment on May 5 and no payments thereafter. The plaintiffs assume that the homeowner lost his job on April 20. Under the current regulation, as interpreted by both parties, May 1 would be the default date. Application of the default date formula in the proposed regulation, however, yields a March 1 default date. (March 1 is 60 days after January 1, the first day of the most recent month in which the mortgagor made a payment within the month due to bring the account current.) Thus, under the proposed regulations, the homeowner in

the example could not use the April 20 loss of employment as a "circumstance beyond his control" in order to qualify for assistance. The default date, by definition, would now occur *prior to* the event notwithstanding the fact that the ultimate default may actually have been caused by the April 20 job loss.

HUD's only argument in response is that the plaintiffs' example does not demonstrate an inherent, universal disadvantage of the proposed regulations, since it only fortuitously places the job loss at April 20 where the proposed regulations will, HUD concedes, restrict eligibility. HUD poses a counter-hypothetical in which the homeowner, who has the same payment history, loses his job in February and then regains employment in April and then—in the HUD hypothetical—makes no further mortgage payments, an unlikely scenario. In this case, HUD argues, the current regulations, which would place the default date at May 1, would actually be less advantageous than the proposed regulations, under which the March 1 default date is closer in time to the job loss. Thus, HUD's argument continues, it is really a matter of chance whether a mortgagor will be hurt or benefited by the changed formula and there is therefore no basis for concluding that the proposed regulations are inherently inferior.

HUD offers no explanation why it has jettisoned one default date formula for another formula that—it would have us believe—can only have a random effect on eligibility. Even putting that incongruity aside, however, HUD's hypothetical is an insufficient answer to the concerns raised by the plaintiffs. Initially, it strikes us as highly improbable that a homeowner who, having lost his job but having continued to make delinquent payments on his mortgage, would—shortly after regaining employment—cease making payments altogether.

But more fundamentally, HUD's rejoinder misses the point of plaintiffs' objection. The effect of the proposed regulation is to tie the date of default to a requirement that the mortgage payment have been made in the month for which it is due.

Therefore, whenever a mortgagor continues for more than two months to make delinquent payments later than the month for which the payments are due, the time frame for "circumstances leading to default," is foreshortened by the proposed regulations. An event *succeeding* the default cannot logically be said to cause the default,[10] and the clear effect of the proposed regulations, under these circumstances, is to limit the range of events that may be considered in determining the reason for a default. HUD cannot explain away the fact that its proposed regulations will exclude from assistance many mortgagors who have fallen behind in their mortgage payments over a period and who thereafter become unable, through circumstances beyond their control, to continue making any payments.

The current regulation, as the parties agree, permits such mortgagors to cure their defaults and still qualify for assistance when some subsequent emergency causes them to cease making payments altogether. The current regulation plainly accords with the letter and spirit of the Amended Stipulation, as another court has already emphatically held. *Etheridge v. Beasley*, 532 F.Supp. 266, 270–71 (N.D.Ga.1981).[11] It is also clear that the proposed regulations will adversely affect the eligibility of a definable class of mortgagors who would be eligible for assistance under the current regula-

tion. The proposed regulation is therefore an impermissible implementation of the general requirement of Section 230(a)(1) and (b)(1) that a default have been caused by circumstances beyond the mortgagor's control.

■ The plaintiffs also point to a change in 24 C.F.R. § 203.606(b) that is contained in the proposed regulations. Section 203.606(b)(3) now provides:

(b) If the mortgagee determines that any of the following conditions have been met, the mortgagee may initiate foreclosure without sending the assignment notices required by §§ 203.651 and 203.652.

\*      \*      \*      \*      \*      \*

(3) The mortgagor owns two or more properties occupied by tenants who are paying rent, and the rental income *from the property under review* is not being applied to the mortgage on *that* property. [Emphasis added.]

The proposed section 203.606(b)(3) would read:

(b) If the mortgagee determines that any of the following conditions have been met, the mortgagee may initiate foreclosure without sending the notices required by §§ 203.650 and 203.651 and without the delay in foreclosure required in paragraph (a) of this section:

\*      \*      \*      \*      \*      \*

---

10. By contrast, in HUD's example, the February job loss might logically be said to have caused a May 1 default (as fixed under the current regulations), despite the relative remoteness in time of the latter event. We presume that, in a proper case, HUD would exercise its "judgment" to find the default in this situation "due to circumstances beyond the mortgagor's control."

11. In *Etheridge*, HUD took the position that § 203.330 of its own regulations was inconsistent with a "Note" in Handbook ¶ 2–1(d) which reads as follows:

The current default is the only one to be considered in determining whether the mortgagor is in default due to circumstances beyond his or her control. If the record indicates that the present default was caused by some circumstance beyond the mortgagor's control, regardless of past history, this criterion is satisfied. If, however, the account

was already delinquent when the qualifying circumstance first appeared, this criterion may or may not be satisfied. The mortgagor's ability to avoid the default may have been affected by the amount of the delinquency which already existed at the time qualifying circumstance occurred; judgment must be exercised. Judgment is required also when an account, which has been chronically in default in the past, is current for one or two months and then a circumstance beyond the mortgagor's control arises and the account goes into default. Generally, if the account was current for two or more months immediately preceding the present default, the default should be considered to be a new one.

The court rejected HUD's argument that this provision of the Handbook required HUD to adopt a "two month rule" similar to the one now proposed for determining date of default.

(3) The mortgagor owns two or more properties occupied by tenants who are paying rent and the rental income is not being applied to the mortgage under review.

The proposed regulation thus automatically excludes from eligibility a broader class of mortgagors than is automatically excluded under the current regulation. Specifically, the proposed regulation would permit a mortgagee to foreclose without notice and without delay any mortgage in default if the mortgagor owns two or more properties occupied by tenants and is not applying the rent from *all* the properties to the mortgage under review even though the rent may be being applied to mortgages on the properties which generated it. The current regulation requires application only of the rental income from the property under review.

HUD has offered no explanation or defense of this apparently inexplicable expansion of the automatic exclusion. The statute as amended does not require or even authorize *any* automatic exclusions. And while it may be that the number of mortgagors affected by this unexplained change in the regulations will be relatively small, it is quite clear that the change will directly and adversely affect their basic rights. We have no assurance that HUD will construe proposed section 203.606(b)(3) as the equivalent of the current regulation. The language has clearly been changed and we can only assume that HUD will apply the revised version since it is less favorable to mortgagors. Therefore, the proposed regulation is inconsistent with the Amended Stipulation. It may not be implemented.

■ Finally, the plaintiffs have drawn our attention to section 203.640(a)(5) of the proposed regulations relating to exclusion from assistance for mortgages on property not the principal place of residence of the mortgagor:

(a) The Secretary may make temporary mortgage assistance payments (TMAP) to the mortgagee on behalf of a mortgagor who owns the property, when the following conditions are met:

\* \* \* \* \* \*

(5) The property is the mortgagor's principal place of residence. This criterion may be waived by the Secretary if such waiver is determined to be in the best interests of the Department.

The current regulations include an additional clause:

(a) The Secretary will accept assignments of mortgages insured under this part in order to avoid foreclosure when the following conditions are met:

\* \* \* \* \* \*

(3) The property is the mortgagor's principal place of residence. This criterion *may be waived* by the Secretary *if the property has been leased or rented and the rental income has been applied to the mortgage delinquency or to effect repairs necessary to maintain the property in a safe and habitable condition* or if such waiver is determined to be in the best interests of the Department. [Emphasis added.]

HUD has contended, and we agree, that the deletion in the proposed regulation curtails no basic rights of mortgagors under the current program. The deleted language is plainly discretionary; it may not be read as vesting in mortgagors any right to waiver of the condition. With respect to this particular section, we therefore conclude that the proposed regulations are not inconsistent with the current operation of the assignment program though the wording, unfortunately, portends that HUD might, in the future, choose to limit the cases in which discretion will be exercised in favor of the mortgagor.

■ The provisions in the proposed regulations for review of payment plans are, however, inconsistent with the Amended Stipulation. Sections 203.643(c) and 203.-648(c) of the proposed regulations would provide for mandatory review of payment plans only in the case of a mortgagor whose gross income has decreased by $50.00 or more per month. The Amended Stipulation, however, in paragraph 7, provides for mandatory review under a considerably wider range of circumstances:

7. HUD shall review and, as appropriate, restructure payment plans of assigned mortgages to ensure that they are reasonable and comport with 24 C.F.R. § 203.650–662 and Handbook 4191.2 under the following circumstances:

    (a) Before any action has been taken by reason of mortgagor default;

    (b) When the terms of such a plan expire;

    (c) When a plan is in default for three months or longer;

    (d) When the terms of an existing plan extend more than six (6) months from the Order date;

    (e) When a mortgagor so requests for good cause.

Under ordinary conditions, we might presume that no negative inference was intended by the proposed regulation's failure to list all of the circumstances which, under the Amended Stipulation, now trigger mandatory review of payment plans. However, the history of this lawsuit demonstrates that HUD is no ordinary litigant. HUD is seeking leave to amend the Amended Stipulation to permit implementation of TMAP apparently totally without regard to the provisions of that stipulation; and in this context, we can only assume that, by these sections of the proposed regulations, HUD intends to bypass or eliminate the review procedures mandated by the Amended Stipulation.

It is quite clear, in any case, that the payment plan review procedures contained in the Amended Stipulation are binding on HUD for the duration of the stipulation with respect not only to the assignment program, but with respect to the new TMAP program as well. To the extent any regulations provide or imply the contrary, they are, unless mandated by statute—as the proposed review procedures in issue here manifestly are not, *see* Section 230(a)(4)—in violation of the Amended Stipulation.

██ The proposed regulations also contain an omission which, the plaintiffs argue, unnecessarily renders the quality of the assistance provided under TMAP inferior to that available under both the current and revised versions of the assignment program. The plaintiffs point to the fact that Section 230(a)(5) requires the Secretary to secure all TMAP that he has provided by a lien on the property. This requirement has no parallel in the assignment program: after assignment, HUD holds the mortgage and thus has no need to seek further security for forbearance assistance.

Plaintiffs argue that in order to effectuate the statutory intent—one to which HUD itself has frequently adverted in the course of these proceedings—that TMAP assistance be equivalent to assignment, the regulations should contain a provision for subordination of the TMAP lien where such subordination is necessary to enable the mortgagor to obtain a home improvement loan. The plaintiffs' expert testified at the hearing that it is frequently difficult to obtain such a loan where the property is subject to a second lien. (Tr. 126–27) HUD's expert testified, to the contrary, that home improvement loans frequently are unsecured and that where lenders do require security, they would not as a matter of course require subordination. (Tr. 461–62) The HUD expert also testified that in those cases where subordination would be required for a mortgagor to obtain a home improvement loan, HUD could exercise discretion to enter a subordination agreement. (Tr. 462)

We are well aware of the importance to homeowners of securing home improvement loans in order to maintain the value of their property and we are convinced that it is an integral feature of the assignment program that it allows qualifying mortgagors to obtain such loans without the obstacle of a second encumbrance on their property. The undisputed intent of the statute is to make TMAP and assignment assistance equal in quality. And the Amended Stipulation unambiguously requires future foreclosure avoidance assistance equal in basic quality to the assignment program. We therefore see no basis for HUD's refusal to provide in its implementing regulations specific provisions for subordination of the TMAP security interest, where necessary to allow a mortgagor to obtain a home im-

provement loan for which he would qualify absent a second lien against his property.

In light of its past record—as we have repeatedly been obliged to emphasize—it is no answer for HUD to say that it would exercise discretion to permit subordination in an appropriate case. HUD has repeatedly demonstrated its unwillingness to exercise discretion in a manner that advances the national housing policies. Accordingly, its regulations must unequivocally require subordination of the TMAP lien where necessary for a mortgagor's access to a home improvement loan that would have been available under the assignment program.

■ The plaintiffs' final objection to the proposed regulations concerns the formula for implementation of Section 230(a)(6) and that portion of Section 230(b)(2) that limits the availability of TMAP and assignment respectively, where TMAP has previously been provided within a 12-month period. Section 230(a)(6), which has been quoted above, provides that TMAP assistance may only be made to those mortgagors who have made full payments for 12 months following a prior period of assistance. And paragraph (b)(2) contains similar language with respect to assignments.[12]

The proposed regulations provide that TMAP shall be deemed to have terminated—for purposes of both subsequent TMAP and subsequent assignment—on the date the last TMAP payment is made. *See* 24 C.F.R. §§ 203.640(b)(5) and 203.644(b)(5) [proposed]. The plaintiffs' position is that this calculation of date of TMAP termination is unnecessarily restricted and onerous ·to mortgagors. They argue that it would be more beneficial if the termination date were automatically set at 18 or 36 months from the date of the first TMAP. If their termination date were used, the plaintiffs argue, a mortgagor who received fewer than 18 months of assistance, 8 months for example, would be permitted additional TMAP if he defaulted again within the 18 month period, notwithstanding the 12-month limitation of paragraph (a)(6).

While we agree with plaintiffs that their proposal would be more beneficial to certain mortgagors, we do not accept their argument that HUD is required to implement regulations incorporating their version of the appropriate termination date. The defect of the plaintiffs' reasoning is that they point to no feature of or requirement or practice under the current assignment program that would necessitate implementing their proposed rule in order to preserve the quality of foreclosure avoidance assistance. Although, as plaintiffs indicate, HUD may have discretion under the current assignment program to allow additional forbearance whenever it chooses, there is no evidence to indicate that HUD must allow or ever has allowed additional forbearance within 12 months of a period of reduced or suspended payments.

Whatever we may think of the wisdom of plaintiffs' proposed implementation of paragraph (a)(6), there is no basis either in the statute or in the Amended Stipulation for requiring it. We therefore conclude that sections 203.640(b)(5) and 203.644(b)(5) of the proposed regulations, which are consistent with the amended statute, are unobjectionable.

In summary, it is apparent that the proposed regulations would permit HUD to charge higher interest on foreclosure avoidance assistance and to allow that interest to begin to accrue at an earlier date than under the current Handbook practice. The proposed regulations would eliminate all restrictions on the level of assistance that HUD is required to provide. In several additional respects, they would limit access to the foreclosure avoidance programs. And finally, the proposed regulations may have the effect of limiting assisted mortgagors' access to home improvement loans.

None of these reductions in the quality of foreclosure avoidance assistance is required by the recent amendments of section 230 and all of them are at variance with current practice under the Handbook as required by

---

**12.** Section 230(b)(3) indicates that assignment may be accepted within 12 months of TMAP assistance, but only where the assignment is necessary to facilitate extension of the mortgage term for up to 10 years.

the Amended Stipulation. HUD has offered no explanation for or defense of many of the challenged downward revisions in the quality of assistance. Implementation of the proposed regulations is plainly impermissible and would be in violation of the Amended Stipulation.

It is clear to us that what HUD sought when it went to the Congress and what it now seeks, by this attempt to modify its agreement with the plaintiff class and its commitment to the Court so as to exempt the TMAP regulations from the requirements of the Amended Stipulation, is to scuttle that agreement and the commitment embodied in the Amended Stipulation and to restrict even further the mortgage foreclosure assistance which it has so niggardly provided thereunder. If the Amended Stipulation is to be modified in any respect, it should be tightened to eliminate the ambiguities and the discretion which HUD has used to restrict the mortgage foreclosure assistance program, thereby frustrating the intention of Congress in enacting section 230.

We must confess our continuing frustration that our efforts to secure reasonable implementation of a program agreed to by HUD which would further the Congressional purpose have been so relatively unsuccessful. Despite a long, disgraceful history of footdragging, HUD now asks us to permit it an even broader range of discretion.

We observed in 1974 that HUD had, by its actions, in effect administratively repealed the applicable statutes which Congress had enacted to enable persons unable to qualify for conventional mortgages to secure their own homes. *Brown v. Lynn, supra,* 385 F.Supp. at 1000. Apparently, notwithstanding its agreements with the plaintiff class and its commitments to the Court, HUD has never abandoned that effort. To give HUD the *carte blanche* which it now seeks would, based on our experience, simply assure that the program would be further scuttled.

If Congress desires to repeal the program for the future, it certainly can do so. So far as the plaintiff class of persons who entered into contracts and mortgages on the assumption that they would be dealt with in good faith are concerned, we feel obliged, within the limits of our authority, to assure them the reasonable opportunity to secure the homes which Congress gave to them. Granting HUD's motion clearly would be a total abrogation of that obligation.

Nothing we have observed about the proposed TMAP regulations and HUD's past performance should be misinterpreted as opposition on our part to the concept of HUD's making mortgage assistance payments in lieu of accepting an assignment of the mortgage, paying the mortgage in full currently and negotiating a relief plan with the mortgagor. The TMAP concept is one with considerable merit in the appropriate case so long as its implementation does not derogate the intent of Congress and the rights of mortgagors under the Amended Stipulation. Unfortunately, the proposed regulations do both.

## CONCLUSION

Plaintiffs' motion to hold HUD in civil contempt is denied. Defendants' motion to modify the Amended Stipulation is also denied and defendants are enjoined from implementing the proposed regulations published at 47 Fed.Reg. 33252 (1982). An appropriate order will enter.